BURGER KING CORPORATION,
Plaintiff,

v.

Vernon J. DUCKREY, Blackstar Res-
taurants/Deptford, Inc., Duckrey En-
terprises/Terminal D, Inc. and
Duckrey Enterprises/Airport I, Inc.,
Defendants.

Case No. 11–23748–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Dec. 22, 2011.

Francis Massabki, Michael D. Joblove, Nina Greene, Jessica Serell Erenbaum, Genovese Joblove & Battista, Miami, FL, for Plaintiff.

***ORDER DENYING "EMERGENCY" REQUEST FOR "IMMEDIATE" HEARING ON "EMERGENCY" MOTION FOR TEMPORARY RE-STRAINING ORDER***

JONATHAN GOODMAN, United States Magistrate Judge.

This cause is before the Undersigned on Plaintiff Burger King's "Emergency" Request for "Immediate" Hearing on its Emergency Motion for Temporary Restraining Order [ECF No. 16], which the Honorable Donald L. Graham referred to me [ECF No. 17]. The emergency request for an immediate hearing was filed yesterday at 4:37 p.m. and Judge Graham referred it to me at 5:02 p.m. yesterday.

Because Plaintiff designated the matter as an emergency and contended that the

circumstances demanded an immediate hearing, the Undersigned stopped work on all other matters in order to focus exclusively on the claimed emergency.

Because there is no actual emergency and because this Court has *already* scheduled [ECF No. 13] an evidentiary hearing for January 10, 2012 on Plaintiff's underlying motion for preliminary injunction, the motion for an immediate hearing is **denied.**

Burger King's advertising and marketing slogan is, among other jingles, "have it your way." The issue now before the Court is whether Defendants' alleged failure to follow Burger King's way is also an *unhealthy* way (thus creating an emergency need for an immediate hearing).[1]

The facts alleged in the emergency request and emergency motion are substantially similar to the allegations in the Complaint and the motion for preliminary injunction: Burger King terminated Defendants' franchise agreements for financial reasons but the franchisees are continuing to operate restaurants under the Burger King trade name and are still holding themselves out as authorized Burger King franchisees. Based on these allegations, the Court scheduled an evidentiary hearing on the motion for a preliminary injunction. After this scheduling order was entered, Plaintiff filed two emergency motions, urging the Court to enter a temporary restraining order without notice to defendants and to hold an immediate hearing.

These two so-called emergency motions are based on what Plaintiff deems, in the memorandum it submitted in support of the two emergency motions [ECF No. 15], "newly discovered facts." The new facts which Burger King believes constitute an emergency requiring an immediate hearing are that the Defendants are selling food products which were not approved or authorized by Burger King. Specifically, Plaintiff contends that the meat in the BK Stacker purchased on December 20, 2011 was *thicker* than the meat which is supposed to be used in the sandwich. Moreover, Plaintiff alleges that the cheese on the Whopper sandwich was "a different shape and a different color" than the approved cheese.

After noting these new developments, Burger King alleges that the sale of these unauthorized food products place the "health and safety of consumers" patronizing the restaurants "at risk" because Plaintiff can no longer control the nature, safety, quality and source of the food products. Similarly, Plaintiff alleges that the sale of the thicker meat and the differently shaped and colored cheese creates "serious health and safety issues that are potentially occurring at the Restaurants which affect the consuming public." [ECF No. 15, p. 2].

Significantly, Burger King did **not** allege that the unauthorized food was tainted, rancid or spoiled, nor did it allege that the items caused food poisoning or other ailments. It did not allege that employees working in the restaurants involved in the now-terminated franchises were engaged in unsanitary practices, are ill or are unqualified to work in the food service business.

---

1. Burger King launched its famous "have it your way" slogan in 1974. It was abandoned in favor of other themes but the company returned to its well-known theme in 2004. http://www.usatoday.com/money/advertising/adtrack/2005–05–234ourger4iing_x.htm (last visited December 22, 2011). The "have it your way" slogan is prominently displayed on Burger King's website, in all bold capital letters in the top middle of the opening page. http://www.bk.com (last visited December 22, 2011).

It did not otherwise allege facts demonstrating or even suggesting the existence of a *bona fide* actual *health* risk. It did not explain how a consumer's *health* would be "at risk" by eating a thicker piece of hamburger meat or digesting a slice of cheese with a different shape and color. The sale-of-unauthorized-food scenarios might bolster Plaintiff's claims for loss of goodwill, product confusion and similar intellectual property claims—but they do not create the type of health risk which Burger King alleges as grounds for an emergency-created immediate hearing.

Likewise, it did not support its apparent theory that the mere fact that Burger King did not itself monitor the recent, post-termination food sales somehow caused a legitimate health risk.[2] Indeed, it seems that every other restaurant in the country other than Burger King restaurants would generate health risks under Burger King's theory (because Burger King would presumably not be monitoring the food sales in those other restaurants, either). Burger King did not explain why food service industry executives and employees other than Burger King staffers could not safely monitor the purchasing, storage, preparation and sale of food products.

Burger King explained that it engaged in what would be considered an "undercover buy" of hamburger products from Defendants and attached an affidavit [ECF No. 15, pp. 20–23] outlining the circumstances of the undercover hamburger purchases. Although Burger King attached photographs of the hamburgers [ECF No. 15, p. 31] to the affidavit, those photographs show little more than shadows, and the Undersigned cannot make out the contents of the images. But even if the photographs were clear and actually depicted what they purport to demonstrate, they would not justify an emergency requiring an immediate hearing before the one already scheduled for January 20, 2012. Instead, those photographs would merely show a bun containing a thicker piece of hamburger meat and a slice of cheese which is of a different shape and color than the cheese authorized by Burger King.

Although it submitted photographs from the undercover food purchases, Burger King did not allege that it had these unauthorized food products *tested* to see if they were unhealthy, unsanitary or otherwise risky to consumers.

Likewise, Burger King did not submit evidence of any kind to demonstrate that the unauthorized food products create a public health risk. For example, it did not show or even suggest why a *thicker* hamburger would be unhealthy, nor did it submit allegations which would permit the Court to discern such a conclusion. The thicker hamburger offered by Defendants might arguably be *more* healthy than the one containing Burger King-authorized meat. Consumers might actually *prefer* the taste of the unauthorized hamburgers and they could have a *positive* attitude about the purchases because thicker meat might be a better *value*.

To be sure, Burger King might be concerned that the *taste* of the unauthorized sales might not be up to its standards, but

---

2. In its memorandum [ECF No. 15, p. 3], Burger King contends that "this matter requires immediate action by the Court because the health and safety of consumers patronizing Defendants' Restaurants are at risk as

BKC can no longer control the nature, safety, quality and source of the food products and services provided at Defendants' Restaurants."

that does not mean that the food is a health *hazard* demanding an immediate hearing. The health hazard, of course, is the only reason proffered in Burger King's papers as the newly-discovered grounds for the so-called emergency which mandates an immediate hearing.

Similarly, Burger King says it is concerned about customer confusion and loss of goodwill, but these potential consequences are not of the type to compel an immediate hearing before the preliminary injunction hearing already scheduled by the Court.

Nowhere in Burger King's papers is there a citation to legal authority granting a TRO or an immediate hearing based on a public health crisis created by terminated franchisee's sale of unauthorized food products. The legal authorities cited relate to injunctive relief for trademark infringement, loss of goodwill, likelihood of confusion, breach of contract and other theories—but not a health risk.

Burger King has not demonstrated why any relief provided by the Court at or shortly after the January 10, 2012 hearing would not be adequate to address its business-related, intellectual property concerns. It has not, as explained above, demonstrated a health risk which might otherwise warrant an emergency hearing.

After filing its emergency request for an immediate hearing, Burger King submitted to the Court (in its efile inbox, as authorized by the Local Rules) a draft of a proposed temporary restraining order. In this proposed TRO (Exhibit "A," attached), Burger King asks the Court to conclude, based solely on the papers submitted, that "there exists an immediate threat to the public health of patrons of the Restaurants which necessitates the issuance of this Temporary Restraining Order."

But under these circumstances, the Court cannot reach that conclusion because Burger King did not even allege facts sufficient to demonstrate the existence of a public health emergency justifying an immediate hearing. Instead, it proffered, in conclusory fashion, speculation that the food sales might somehow create a health issue for the consuming public. Indeed, a close review of its submissions demonstrates that Burger King itself describes its allegations in somewhat equivocal language. For example, it alleges that the public health is "in jeopardy" [ECF No. 16, p. 4], that "there are serious health and safety issues that are **potentially** occurring" [ECF 15, p. 3] and that there is a "**potential** threat to the consuming public." [ECF 16, p. 2]. Because Plaintiff's allegations about a public health emergency are speculative guesses, they do not create the need for an emergency-based immediate hearing. *Padilla v. Nevada*, No. 3:08–cv–410–LRH (WGC), 2011 WL 5833663, at *5 (D.Nev.2011) (prisoner's demand for injunctive relief rejected because his allegations were "nothing more than a threadbare recital that his health will be at risk if the injunction is not granted") (further explaining that the plaintiff did not provide evidence to show he would suffer injury without medications, treatment or transfer to another housing unit, and concluding that plaintiff did not prove that the health risk is "real and immediate, and not conjectural and hypothetical").

Finally, the Court notes that Burger King did not follow the required procedure under Southern District of Florida Local Rule 7.1(e) for the filing of an emergency motion. This Local Rule requires counsel to file a "Certification of Emergency Form," and this form was never filed.

For all of these reasons, Plaintiff's emergency motion for an immediate hearing is

**denied.** If Burger King uncovers evidence that tainted food is being served at the restaurants at issue or that unsanitary conditions exist or that consumers have become ill, then it may file another motion for an immediate hearing. Otherwise, the Court will address the issues alleged in the emergency motion for an immediate hearing at the already-scheduled evidentiary hearing on January 10, 2012.

*Plaintiff is instructed to serve a copy of this order on all Defendants by fax and overnight mail.*

## TEMPORARY RESTRAINING ORDER

DONALD L. GRAHAM, District Judge.

THIS CAUSE came before the Court on Plaintiff Burger King Corporation's ("BKC") Emergency Motion for Temporary Restraining Order [DE ——], Memorandum of Law in Support of its Emergency Motion for Temporary Restraining Order [DE ——] and Emergency Request for Immediate Hearing on its Emergency Motion for Temporary Restraining Order [DE ——] (collectively the "Emergency Motion"), filed on December 21, 2011, and the Court, having reviewed the foregoing and otherwise being duly advised in the premises, it is hereby

ORDERED and ADJUDGED that

1. Based upon the evidence presented by BKC in its Emergency Motion, it is likely that:

a. BKC is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Miami, Florida. BKC is engaged in the business of operating a national and worldwide system of company-owned and franchised BURGER KING® Restaurants.

b. BKC has developed a comprehensive restaurant operating system for all BKC franchisees in order to protect the image of BURGER KING® Restaurants and to ensure uniform, high quality standards (the "Burger King System"). Additionally, BKC has extensively employed, caused to be advertised, and publicized throughout the United States certain distinctive symbols as trademarks and service marks to identify the source, origin, and sponsorship of BKC's facilities, products, and services (the "BKC Marks").

c. Defendants Vernon J. Duckrey and Blackstar Restaurants/Deptford, Inc. (collectively "Defendants") owned and operated two franchised BURGER KING® Restaurants, located at 877 Cooper Street, Deptford, NJ 08096 (BK # 7561) and 1750 Deptford Center Road, Deptford, NJ 08096 (BK # 17382) (the "Restaurants") in accordance with the terms and conditions of two BURGER KING® Restaurant Franchise Agreements (the "Franchise Agreements").

d. The Franchise Agreements each contain provisions obligating Defendants to, among other things, make monthly payments to BKC in return for the right to use the BKC Marks, as well as the BURGER KING® System, in the operation of the Restaurants.

e. Due to Defendants' failure to timely pay amounts due to BKC after notice and an opportunity to cure, the Franchise Agreements terminated effective July 21, 2011 and the Restaurants are thus no longer affiliated with BKC.

f. Under the Franchise Agreements, which specifically set forth the rights and obligations of the parties in the event of termination, Defendants specifically agreed to cease operating the Res-

taurants as BURGER KING® Restaurants and to desist from all use of the BKC Marks immediately upon expiration or termination of the Franchise Agreements.

g. Specifically, the Franchise Agreements provide, in pertinent part, that after termination of the Franchise Agreements, franchisees, such as Defendants, have no right to use the BKC Marks or the Burger King System and are prohibited from identifying themselves as either a current or former BURGER KING® franchisee, from using any of BKCs trade secrets, promotional materials, the BKC Marks or any mark confusingly similar.

h. The Franchise Agreements also provide that terminated franchisees, such as Defendants, are further required upon termination or expiration of their franchise agreement, to (1) immediately make such removals or changes in signs and the building as BKC shall request so as to effectively distinguish the building and premises from its former appearance and from any other BURGER KING® restaurant, and (2) return their operations manuals to BKC.

i. Defendants have failed to adhere to these post-termination obligations under the Franchise Agreements as a result of their failure to cease operating BK # 7561 and their failure to de-identify and secure BK # 17382.

j. Specifically, BKC personnel observed the following at the Restaurants during visits on December 19–20, 2011, including:

- A sign at the drive-through stating that BK # 7561 was closed on December 19, 2011;

- However, the next day, December 20, 2011, the drive-through at BK # 7561 was open and serving unauthorized food products;

- Specifically, the meat in the BK® Stacker was not the correct meat and was thicker than what is supposed to be in a BK® Stacker;

- Additionally, the cheese on the Whopper® sandwich was not the type of cheese authorized by BKC and was instead a different shape and a different color;

- Based on the field experience of BKC's declarant and also based upon the fact that BURGER KING® food products are no longer being shipped to Defendants, the food products that were served by Defendants on December 20, 2011 were not authorized or approved by BKC;

- Further, when ordering, the person working at the drive-through window advised that only certain products on the menu were available;

- BK # 17382, which is located in a shopping mall food court, was observed on December 19, 2011 and was closed;

- However, because BK # 17382 is in a mall food court, it is open to the public and not secured.

k. BKC has been unable to inspect the Restaurants and monitor the food products provided therein when Defendants' license to operate the Restaurants as BURGER KING® Restaurants expired.

l. In light of the above, there exists an immediate threat to the public health of patrons of the Restaurants which necessitates the issuance of this Temporary Restraining Order. These patrons are at risk, because BKC can no longer

monitor and control the nature and quality of the food products, sanitation and other goods and services provided at the Restaurants.

m. Without such supervision and quality-control mechanisms, the consumers patronizing Defendants' Restaurants are in jeopardy of receiving food products that are not prepared or served in accordance with local health code regulations and the stringent BURGER KING® standards, especially in light of Defendants* demonstrated willingness to sell unauthorized food products not approved by BKC and to operate their Restaurants post-termination.

n. In addition, the economic and intangible value of the goodwill and reputation associated with BKC's Marks are being threatened and tarnished by the unauthorized use.

o. As a result of Defendants' continued use of the BKC Marks and the BURGER KING® System, consumers who patronize the Restaurants have no way of knowing that the Restaurants are no longer affiliated with BKC. Defendants' continued use of the BKC Marks and the Burger King System, as well as their failure to comply with the post-termination covenants of the Franchise Agreements, has and will continue to induce consumers to patronize the Restaurants under the mistaken belief they are genuine and authorized BURGER KING® Restaurants.

2. As set forth above, Plaintiff BKC has demonstrated a substantial likelihood of success on the merits of this matter.

3. Plaintiff BKC has already suffered irreparable injury to its reputation by virtue of Defendants' unauthorized appropriation of its trademarks, service marks and good name. As set forth above, Defendants are selling unauthorized food to the consuming public, which is at risk of not being safe to consume and which may jeopardize the consuming public's health and safety. Thus, there exists a substantial likelihood of further irreparable injury to Plaintiff BKC and confusion to third parties unless a temporary restraining order is granted immediately without notice.

4. The substantial likelihood of further injury to Plaintiff BKC outweighs whatever damage this temporary restraining order may cause Defendants,

5. As a result of the substantial likelihood of customer confusion associated with Defendants' unauthorized operation of BK #7561 as an authorized BURGER KING® Restaurant and the risk of harm to the health and safety of the consuming public, *inter alia,* the issuance of this Temporary Restraining Order is in the public's interest.

6. This Temporary Restraining Order is granted as a result of the immediate and irreparable nature of the harm being suffered by Plaintiff BKC.

7. Defendants Vernon J. Duckrey and Blackstar Restaurants/Deptford, Inc. and all persons acting on their behalf, in concert with them, or under their control, are hereby enjoined and restrained from engaging in, doing, committing, or performing, directly or indirectly, any and all of the following acts, or any of them:

a. manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of BKC's trademarks, service marks, and confidential, proprietary, or trade secret information, or any colorable imitation thereof;

b. displaying or using any of BKC's trademarks, service marks, and confidential, proprietary, or trade secret in-

formation to advertise or promote the sale of, or to identify, any restaurant, product, or service;

c. making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants, the Restaurants and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Burger King Corporation; and

8. That Plaintiff, Burger King Corporation, need not post a bond and such requirement of posting a bond is waived given the financial status of the Plaintiff, Burger King Corporation. This Temporary Restraining Order is immediately effective and shall last for fourteen (14) days following the issuance of this Temporary Restraining Order, unless extended by further Order of this Court pursuant to Fed. R.Civ.P. 65.

9. The Motion for Preliminary Injunction previously set for January 10, 2012 [DE 13] is hereby rescheduled for _____.08 DIVW⧉